The next case we're going to hear is Titlemax of Delaware v. Weissmann, Appellant Number 21-1020. May it please the Court, I'm Claudia Tesoro from the Attorney General's Office, and I'm here on behalf of the Appellant Secretary of the Department of Banking of Pennsylvania. I'd like to reserve three minutes for rebuttal if needed. That will be granted. This dispute does not involve any regulatory action by Pennsylvania against Titlemax. It stems from a request for information, and for that reason it doesn't implicate the Dormant Commerce Clause or the Commerce Clause generally, and that should be the end of the matter. The dispute began in 2017. Mr. Tesoro, could you keep your voice up? I'll try, Your Honor. Okay. Sorry. You may want to pull the microphone just a tad closer to you, like the top of it. You could pull maybe a little closer. Last time I was here, I wasn't able to move it. But either it was me or there was a different setup. Is that better? Yes, thank you. You said that the amusement involves an information request and not a regulatory dispute, but in fact, aren't you acting under the authority of state law to require an out-of-stater to do something, i.e., produce information? But as I want to explain a little bit further, the fact that they were asking for information in order to undertake an investigation is just a crucial first step, which the Supreme Court of the United States explained decades ago in a case called Oklahoma Press Publishing Company v. Walling. And with the Court's permission, I'd like to read a sentence from that decision, which is illuminating. The very purpose of the subpoena and of the order, as of the authorized investigation, is to discover and procure evidence not to prove a pending charge or complaint, but upon which to make one if, in the administrator's judgment, the facts thus discovered should justify doing so. That was a price control matter, and the case was decided back in the late 40s, I believe. Sotomayor, is that a Commerce Clause case? Commerce Clause, per se, no, but it was about regulatory authority. So you have the power to investigate, but does it speak at all about the Commerce Clause implication of that, exercising that authority? I don't believe it did. Okay. But my point is, and this Court has echoed it, for example, in University of Medicine and Dentistry of New Jersey v. Cargan, in the ordinary course of an investigation is the beginning of a process that may or may not lead to an ultimate enforcement action. The decision to investigate is normally seen as a preliminary step, non-final by definition, leading to the possibility of final action in the form of an enforcement or other action. But don't you have to have a, I'm using more criminal thinking, but don't you have to have a good faith basis that if you were to gather that information, it would lead to an ability to enforce a state law on the acts of another? Well, I'm sure the Department of Banking believed there was a reason to look into this matter. They must have had some information at hand that convinced them that title loan companies like TitleMax warrant investigation. So the rule that you'd like us to impose here would be at the investigative stage, if it's only requesting information, no Commerce Clause considerations, anyone in the country is subject to having to provide information to the Commonwealth upon request. That's the rule because it's not an action to enforce. It's simply a request for information. That's right, and that very approach was taken just recently in the past few months, relying specifically on the Oklahoma press case that I just mentioned by Judge Rambo in the middle district of Pennsylvania in a case that's quite similar to this called auto equity loans. Was that in any briefing, auto equity? I don't think so. The decision is very recent, although it might have overlapped with when the briefing was being carried out. I'll be glad to send you the site. What's the status of the petition to enforce the subpoena in state court? Well, that has been around for quite a long time in one form or another since 2017 also. Since the remand from middle district of PA back to the state courts, what happened? After the remand from the middle district back to Commonwealth Court, my assumption is that nothing has happened. That was fairly recent, but the litigation went on in the district of Delaware and addressed the issues that we're dealing with now. So there's been no contempt proceeding, there's been no enforcement order, nothing like that? No, I think I'm not sure if it's at the initiative of the court or the initiative of the parties, but basically I think that's been on hold because there's been so much going on in the district of Delaware until now. Let's assume we have to consider the Commerce Clause for the purpose of this discussion, since that seems to be one of the grounds that the district court discussed. As I understand the transaction here, Pennsylvanians would leave the state, they'd go to a brick-and-mortar store, they'd complete paperwork, they'd leave with a check, they'd return to the Commonwealth of Pennsylvania. The only things that happen in Pennsylvania thereafter, and correct me if I'm wrong, is the Pennsylvania borrower would make payments, the Pennsylvania borrower is at risk of having the vehicle repossessed. Is that the activity in Pennsylvania? Is that the interest in Pennsylvania? Strike that. Is that the activity in Pennsylvania? Well, I think that was a very basic description, I guess, but the Pennsylvania, the concern in Pennsylvania is that the, what they call servicing in the papers in this case, after the granting of the loan, there's still servicing, and there's still collection activities, and there are still, as I understand it, efforts by Title Max, let's say, to get in touch with a Pennsylvania person and say, hey, you've got a contract here, you owe us a payment, and there are measures that are taken that ultimately, as you pointed out, could result in a repossession, repossessions themselves at the direction of Title Max, as I understand it, occurred in Pennsylvania, although they had ceased doing that for the time being, I guess because of this litigation, but that was certainly, to the extent that there were repossessions in Pennsylvania for Title Max, that was conduct in Pennsylvania. And so, I think that's the consequence of those events for a Commerce Clause analysis. You have to assume with me that we're not going to accept the view that an investigative act is immune from Commerce Clause analysis, but assume that we have to at least consider the Commerce Clause. What, if anything, does that mean?  And what do those events mean for Commerce Clause purposes? Well, the Commerce Clause analysis is, or I should, instead of using the word analysis, I'll say, as I understand Title Max's theory, they believe that they do nothing in Pennsylvania, their conduct is wholly within Delaware and the other states where they operate, and therefore, the Commerce Clause isn't implicated. They, as I said, believe that the Commerce Clause isn't implicated anyway because of the nature of this litigation. But if the Commerce Clause, excuse me, if they are right, that they really and truly, wholly operate outside of Pennsylvania, then perhaps they would be safe. But our position is that it's not so clear, and that's what we're entitled to look into. If the investigation goes forward and all of the information that's been requested is collected and organized and reviewed, and somebody says, you know, the six people in the entire state ever did anything that had any kind of interstate implications, this is not enough of a basis to proceed on our hunch that there might be a legal problem under Pennsylvania law, that could happen. I'm not... That's a, for lack of a better word, a regulator's or a prosecutorial type decision. But I gather what you're trying to say is there's enough information to suggest this is not a wholly out-of-state conduct.  Why does the Department, why would the Department want to take that tact? In other words, if you couldn't bring an enforcement action because the conduct was wholly within another state, as it appeared facially, why would the Department want to spend its resources to investigate something that impacted interstate commerce as opposed to Pennsylvania? If I understand the premise of your question, you're saying that the Department had no reason to believe there was anything going on that impacted Pennsylvania, but the Department had enough in its hands to allow it or to justify its pursuing the request for clarification and substantiation. At that step now, the opposing party is saying, based on what the Department clearly knows from what they've told us in their petition, and they said some of that in the petition, we think that this is a violation of the dormant commerce clause. And they set that question up in the District Court of Delaware. And the District Court judge and magistrate judge ruled on that. So that's the issue we have in front of us here. As I see it, that's the major issue we have in front of us. And I just don't understand how skirting that question to focus on the investigative question is advancing anything. And what I directly want you to reference is try to distinguish for us, if you can, this case in the District Court's decision in this case, from the Seventh Circuit's decision in Midwest Title v. Mills. The Seventh Circuit decision, as the premise of your question now is, they would have agreed with Title Max here, I'm sure. But the problem we see with that is that that decision was several years ago. Inside the decision itself, and I don't have it in front of me, but there is a passage that states that Title Max was a decision of the Third Circuit. And there is a passage where the Seventh Circuit says other circuits don't view things quite this way, and it cites the Third Circuit's own decision in information systems. The Seventh Circuit also relied on the concept of personal jurisdiction that was in effect perhaps at that point under the Supreme Court, and that jurisdiction was defined by personal, nonphysical contacts, and by online and other kinds of communication, such as the Wayfair decision of the Supreme Court that came afterwards. So the reasoning of the Seventh Circuit is not persuasive. It's certainly not binding on this Court. And this Court's information systems decision, which is cited in our briefs, specifically points out that this Court's view is, frankly, broader in terms of what might or might not fall within the Commerce Clause. And it uses the phrase there's not to be balkanization. As far as we're concerned, Title Max is asking for balkanization. If they say they're not going anywhere over the line, they're not, and there's no need to look into it further. That's an interference with Pennsylvania's authority to protect its own citizens and investigate pursuant to its own laws. Okay. Thank you. We'll stand for a vote. Good morning. May it please the Court. My name is Richard Zak, and I represent the appellees, the Title Max entities. And we respectfully request that this Court affirm the District Court's decision that the Constitution prevents Pennsylvania from imposing its laws on activities that occur outside of Pennsylvania. How do you get around the fact that there is activity in Pennsylvania by those borrowers, those Pennsylvania borrowers? Yes, so the activity that occurs in Pennsylvania, which, as Your Honor points out, is the risk of repossession. And just to correct the record. And also payment on the loan. And payments as well. Those activities are governed by Pennsylvania law. And so the Pennsylvania law of repossessions applies to every repossession the Title Max would do in the state. Well, okay. I'll stay with you for that. So part of this is repayment of the loan. Part of the loan includes payment of interest. Why isn't that, if the repo is subject to Pennsylvania law, why isn't the other activity that occurs in Pennsylvania subject to Pennsylvania law, including what the interest rate can be? So the contract was formed, executed, and completed in Delaware. So the process that occurs in Delaware, and this occurs wholly outside of Pennsylvania, is application, underwriting, the appraisal of the vehicle, the decision on whether to make the loan, the setting of the interest rate and the terms of the loan, that all occurs wholly outside of Pennsylvania in Delaware. The activities that occur, the interest rate has already been set in Delaware. The how payments are made, you know, if there is some law in Pennsylvania about how collection activity has to occur, that's absolutely covered by Pennsylvania law. That occurs in Pennsylvania. The only thing that the district court found that was beyond the reach of Pennsylvania law is the formation of that agreement and the terms of that agreement. It is not Title Max's position that Pennsylvania law is helpless to regulate how these loans are collected or activity that occurs in Pennsylvania. And just to correct the record, the repossessions that Title Max did, that was stopped long before this litigation or this issue arose. It is not made a repossession in Pennsylvania, you know, prior to the litigation for some time. But... It stopped making loans to a Pennsylvania consumer. And stopped also engaging in repossession activity? No, that occurred before. The decision to stop repo was before 2017? Correct. How do you get around the Alden cases, Alden v. Packel, Ryan v. La Folt, which are Third Circuit, Tenth Circuit, and Seventh Circuit cases? That really seem to speak to the very issue you've presented. And Judge Gibbons, I think, wrote the opinion that was embraced by other circuits, saying this is conduct that can be regulated by the state. So the conduct that can be regulated by the states is the conduct that I outlined before. Midwest Title and Goldman, which is a case in this circuit, squarely hold that the extraterritorial principle applies to cases like this. And so there is, and what those cases hold is there is activity that occurs that is outside of the jurisdiction of the state of Pennsylvania. And doesn't that with the Alden court, ALDEN, those decisions all say that you can regulate where the interest rates were set outside the state, but were being collected, the money was collected in state? So I think Midwest Title and this case present a different issue. In these cases. When you say these, are you talking about the Alden cases or are you talking about your case? I'm talking about our case. Our case presents a different issue, squarely addressed by Healy in the Supreme Court, as well as Midwest Title. And Midwest Title is precisely on all fours with this case. And I think I disagree with counsel for appellant about the foundations of Midwest Title. It does not rely on Quill. Not for the proposition that appellant says. It simply notes that it does not rely on it for the physical presence issue. The citation that they make to Midwest Title and say it relies on Quill for the physical presence test, that's not what that part of the case says. What Midwest Title relies on clearly is the extraterritorial principle. How do you reconcile Midwest Title and the Alden cases? Specifically on that territorial principle. I'm with you on Quill, but if you could answer Judge Schwartz's question specifically with respect to the extraterritorial principle, that would be helpful. Okay. So the way the extraterritorial principle works. So there could be multiple parts of a transaction. The activity that occurs that we, that the cases say is beyond the reach of Pennsylvania is the setting of the terms of the contract. Other activity that occurs in Pennsylvania, so effects that happen in Pennsylvania, like collections, like repossessions, those are not beyond Pennsylvania law. And that's clearly what Healy says, the Dormant Commerce Clause, as well as Midwest Title say is the proper rule in this case. And your view of collections, is that repayment on the loan? When you use the word collections, what's captured by that? The payments are accepted in Delaware, applied in Delaware, calculated in Delaware, but the method or the way the loan is paid is governed by the Pennsylvania UCC. But what Midwest Title and Healy say is that the conduct or the activity of the state that's beyond the state's authority is resetting that interest rate, is changing the interest rate because, or some other term of that contract, because something later occurs in Pennsylvania. And that violates, that is a violation of the Commerce Clause. But the statute doesn't only regulate the terms of the contract, right? The origination and the execution of the contract, but also it's the collection of the interest under that contract. It does. It does. And so whatever rules there are with respect to how the loan is collected, or how cars are repossessed, which is a different statute. It's not just the mechanism and how it's collected. It says no person shall, on loans of such and such amount, collect interest in the amount that exceeds, whatever. It's connected to the price. It's not just how it's collected. It's tied back to the interest rate. There's an interest rate cap in Pennsylvania that Your Honor refers to. That's exactly what Midwest Title and Healy say, that the Dormant Commerce Clause prevents Pennsylvania from setting that price in Delaware. So yes, the statute, both the LIPL and the CDCA, refer to interest rate caps under Pennsylvania law. But those interest rate caps, the Constitution prevents them from being applied to loans that are made outside of the state of Pennsylvania. I still don't know how you're not, that we're not bound to follow Alden. The Alden cases, which seem to endorse the application of the interest rates of one state on a transaction that occurred in part in another state. I haven't heard an answer to that question. And the answer to that is that those are not Dormant Commerce Clause cases. The Dormant Commerce Clause. Some of them talk about the Commerce Clause. The language and the holding in Healy and the holding in Midwest Title, as well as the record. So every time I ask you about Alden, you keep talking about Healy. Let me just ask you about Healy. Healy was a good, right? It wasn't an ongoing relationship, right? The object at issue in Healy was the sale of a good. It was a sale of beer. Right. And so that's not like this case, where there's an ongoing relationship between the parties where the transaction isn't really completed until the loan is paid. So I'm not sure Healy actually fits this situation. I understand why you're embracing Midwest. I get that. But I just don't see how Healy helps you. So Healy talks very specifically about this principle that the Commerce Clause precludes the application of a state statute to commerce outside the state, even if there are effects in other states. Specifically addresses that. And in the beer example, I know that the appellant has talked about how there are no impacts in other states with the sale of beer. And that's clearly untrue, because there are lots of impacts about the consumption of alcohol that occur in other states. There's very few transactions that would have only implications within a particular state. And that, I think, you know, drawing, there's certainly effects that could occur based on the consumption of alcohol in other states. And clearly Healy contemplated that. And what Healy talked about is not just if the Connecticut statute was upheld, but what if all the other surrounding states adopted conflicting laws that were different, and so, you know, where merchants were unable to comply with, you know, each state's law. And that's the situation we would have potentially in Delaware with Title Max, is you'd have one interest rate for Pennsylvania consumers. You'd have another interest rate for New York consumers. You'd have a third interest rate. But didn't Congress already sort of say that's okay with either truth in lending or one of the other federal statutes that deal with lending where it says that there could be different interest rates? The lender might have to deal with that. I mean, Congress has already sort of said that's not a burden for Commerce Clause. Right? So you could have, certainly there are situations, not like this one, where the activity occurs just in Delaware. There are multiple interest rates that could apply. So someone who's applying for a loan while in Pennsylvania, and the lender is in another state, certainly, you know, there might be a situation where that borrower would be entitled to a certain interest rate under Pennsylvania. I mean, there are interstate laws that govern that. Yes. Yeah, there are federal laws that govern that. Exactly. Mr. Zack, let me ask you a question here. As I hear your argument and recall Mr. Sarah's argument, your positions are not necessarily irreconcilable. You're saying here that the district court in Delaware said that Pennsylvania's attempt to regulate the interest rate that you charge on your loans at your brick and mortar stores violates the Dormant Commerce Clause. Mr. Sarah is saying, she wasn't saying OK, but assume that you were right. She's basically saying all we're trying to do on behalf of the Department of Banking is get information from Title Max as to the activities that take place in Pennsylvania. And you said the Dormant Commerce Clause decision doesn't necessarily impact the activities in Pennsylvania. So, yes, Your Honor, and so her position that they're just investigating what you're doing and your position that there is a Dormant Commerce Clause violation by trying to regulate the interest rates you charge are inconsistent? In many ways it is, Your Honor. And there is a pending proceeding in Commonwealth Court regarding the subpoena. And you've even said you're willing to go back and start that. We anticipate that it's pending now. It's being litigated. So why are we here? Because the district court found that the application of Pennsylvania's interest rate laws to Delaware loans violates the Commonwealth. And you say that it does. And if we agree with you, you can go back to the Commonwealth Court. And we would litigate the subpoena there. And the only thing that's before Your Honor, before the court, is the declaratory judgment that we got from the district court saying that the interest rates do not apply to the loans that we make in Delaware. Certainly, the Department of Banking is entitled to investigate whatever is within its jurisdiction, including, for example, satisfying itself or investigating whether or not Title Max makes loans in Pennsylvania. That would be perfectly appropriate for them to do. Now, in our view, given the amount of  evidence, that's certainly not a question in their mind. They understand that. They know that. That is not disputed, that Pennsylvania or that Title Max does not make loans in Pennsylvania. But I guess the point where somebody is going to hit a brick wall is in the Pennsylvania investigation, if it goes forward and they try to reconstitute the interest rate on the loan, they've got to look under what you did in Delaware. Correct. That would, in our view, that would prohibit them from recasting is the term that they use. The Deputy Secretary of Banking testified extensively in the Delaware litigation that what they would do, if there's any activity in Pennsylvania, is recast, recalculate the contract and the interest rate. But your argument really is that's for another day. The district court has decided that, that that would be inappropriate. There are certainly things that the Department of Banking is allowed to investigate. They have a subpoena enforcement proceeding pending in the Commonwealth Court that we can sort those issues out. But what we're asking this court to do is affirm the declaratory judgment by the district court that the interest rate laws do not apply because they violate the And if you got an affirmance, their enforcement activity is over. Right? Because there'd be a ruling from our court saying you can charge anything you want. And so their investigation would end. No. Well, not necessarily charge anything we want. Charge interest rates consistent with Delaware law. OK. Right. Which even though it is contrary to Pennsylvania law. Right. So the investigation is over. Well, I mean, certainly they could investigate are we making loans in Pennsylvania, which those loans would be subject potentially to Pennsylvania law. We don't make loans in Pennsylvania. We make them in Delaware. I know. So the logical conclusion is we only make them in Delaware. And we have we have a court order saying we're not subject to Pennsylvania law. They have nothing to investigate. Right. I mean, unless there's something else in the statute that they or the statutes they enforce that they seek to investigate. And do you happen to know the status of the Pennsylvania Commonwealth Courts enforcement petition? What's the status? So that was filed. It was removed to federal court in the middle district. It was remanded back to state court. No action has been taken. We're awaiting a briefing schedule, a scheduling order on that. That has not been issued in the Department of Banking has not pursued. They have not sought to get a scheduling order or anything like that. And awaiting a briefing schedule on what subject? The argument over whether the subpoena should be enforced. Oh, we're just at that very preliminary stage. OK. Thank you. In 2015, then Judge Gorsuch in a case called National Pork Producers Council synthesized Healy and Baldwin in those cases and said that there are three essential characteristics for the extraterritoriality principle. One, that the state law was a price control statute. So prices paid in-state with those paid out-of-state. I don't see that here, but you can correct me if that's wrong. And three, that the effect of raising costs for out-of-state, that it has the effect of raising costs for out-of-state consumers or rival businesses. If we use that rubric, how does this case fit within it? OK. So Judge Porter, with respect to the second prong, which links in-state prices with out-of-state prices. According to the department's theory, and what Deputy Secretary Knopp testified to, is the price in Delaware would be controlled by Pennsylvania law. So if someone went to Delaware, got a loan in Delaware, and was a Pennsylvania resident and made some, either made a payment from here, that would control that price of that loan. That would reset to that six, either six or 24 percent, would be six in this case. So that second prong would apply. And the effect that it would have on interstate commerce is it would create that effect that Healy talked about, which is every other state's law potentially applying in Delaware, which would make it nearly impossible, as Healy talked about, for a Delaware company that's licensed in Delaware to operate. Thank you. I just made note of a couple of things, and I'll try to be coherent about it. But starting toward the end of Mr. Zack's argument, he said they want the judgment affirmed, insofar as it talked about the regulation of the loans here. But it's OK with Title IX to go back to Commonwealth Court and finish what was going on there. I think that's backwards. I think that's acknowledging almost the point that we've been making all along, which is the district court jumped the gun. The district court should not have entertained, let alone resolved, the substantive commerce clause matter until the subpoena matter was resolved. And for that, the doctrine that the district court should have invoked would have been younger? Well, that would certainly have made a big difference if the district court had done that. But what would the district court's authority otherwise have been not to act? Well, if the district court had invoked younger, everything would have been state. It is true, I believe, under younger case law that people can sort of set younger aside and continue without that being a waiver of the argument on behalf of the movement who urged the court to address younger, and that would certainly be true here. Younger was raised all along. So you argue, though, that procedurally that would be the right way to go. But you're concerned about the declaratory judgment if you get back to Commonwealth Court and try to recast the interest rates. We're concerned that the resolution of that interest rate issue that the district court, as I put it, jumped the gun on, would then have repercussions when we go back to Commonwealth Court. And the Commonwealth Court wouldn't enforce the... So although it would be for another day, your day is going to be pretty short. Well, it would be ripped out from under us because of this premature adjudication of the substance of the case that we were trying from the beginning to litigate in a sensible manner. But we've been bouncing from court to court and have been reluctant to see it this way. See it our way, excuse me. I also would just like to point out that the extraterritorial concept, as Judge Porter seemed to be saying, is very narrow under current law. And the way that Title Max has relied upon it is not consistent. Should it apply here at all? Not as far as we're concerned because we don't acknowledge that everything was done in Delaware. At a minimum for that reason. So we ask the court to reverse and allow this case to proceed in the normal course. Thank you. Thank you. We thank counsel for their arguments and their excellent briefing and we'll take the matter under advisement.